#### 4882.   ARLINGTON OIL AND GUANO CO. v. SWANN.
#### 4900.   SWANN v. ARLINGTON OIL AND GUANO CO.

1. A promissory note for the purchase-price of fertilizer, executed after the act of December 18, 1901, went into effect, is not void merely because the tax-tags required by law were not attached to the packages containing the fertilizer.

2. Under the act of August 27, 1911, if the actual value of the fertilizer sold falls more than 3 per cent. below the guaranteed commercial value, the seller can recover only the actual value of the fertilizer, and is liable to the purchaser in damages to the extent of 25 per cent. of the purchase-price.

3. The branding of the words "high grade" upon a package of fertilizer which actually contains less than 1.65 per cent. nitrogen does not render an obligation given for the purchase-price of the fertilizer entirely void. The remedy of the purchaser is to recover the damages prescribed by the act of 1911, and to reduce the amount of the recovery to the actual value of the fertilizer, if it falls more than 3 per cent. below the guaranteed commercial value.

4. Where the purchaser of fertilizer executes a promissory note in which it is stated that the seller expressly declines to warrant the quality of the fertilizer, but only warrants that the laws of the State have been complied with, the purchaser can not recover damages, other than those provided by the act of 1911, because of the inferior quality of the fertilizer and the consequent failure of his crops.

5. A certified copy of the official analysis of a brand of fertilizer registered with the department of agriculture is admissible in evidence in any of the courts of this State, in any case in which the question of the actual ingredients contained in the fertilizer is material. After a brand of fertilizer is registered with the department of agriculture the grade can not be lowered; and it is therefore to be presumed that all fertilizer of that brand, sold after it is thus registered with the commissioner, contains substantially the same ingredients, and a certified copy of an analysis of the brand so registered, made at any time by the State chemist, is admissible in evidence. It is not essential that it should appear that the analysis was made from a sample taken from the particular lot of fertilizer for the purchase-price of which recovery is sought.

6. As the verdict indicates that it could not have been based upon any of the defenses which the court erroneously refused to strike, the judgment overruling the plaintiff's motion for a new trial will not be reversed. The defendant's motion for a new trial was properly overruled, under the principle announced in the first headnote.

DECIDED OCTOBER 7, 1913.

Complaint; from city court of Blakely—Judge Sheffield. April 21, 1913.

*Smith & Miller, Glessner & Park,* for plaintiff.

*G. D. Oliver, Rambo & Wright,* contra.

POTTLE, J. The Arlington Oil and Guano Company sued Swann on two promissory notes,—one for the principal sum of $397.58, with interest at 8 per cent. per annum from October 1, 1912, and the other for $840 principal, with interest at 8 per cent. per annum from October 1, 1912. There was no defense as to the smaller of the two notes. The consideration of the larger note was 400 sacks of "10-2-2" commercial fertilizer. It was recited in the note that "the said payee expressly refuses to make any warranty of the same or any representation as to its quality or value, leaving me to rely solely on the fact that the laws of this State have been complied with." The defendant, by answer, set up the following defenses: (1) That the fertilizer was in sacks of 200 pounds each, branded, "Arlington High Grade Guaranteed Analysis, Available Phosphoric Acid 10.00%, Nitrogen, 1.65/100%, Potash 2.00%," with a guaranteed commercial value of $21 per ton, at which price the same was sold to the defendant; that the fertilizer actually contained 10 per cent. phosphoric acid, 1.32/100 per cent. nitrogen, and 2.04 per cent. potash, determined by an official analysis made on or before the first day of March, 1913, by authority of the State of Georgia from samples taken by an inspector of the State; that the

actual value of the fertilizer was $19.78 per ton, or $1.22 less than the guaranteed commercial value, and more than 3 per cent. below such value; and for this reason the consideration of the note has failed to the extent of the difference between the guaranteed commercial value and the actual commercial value of the fertilizer. (2) That on account of the difference, as above set forth, between the guaranteed commercial value and the actual commercial value of the fertilizer, the plaintiff is liable to the defendant, in addition to the difference between the two values, in the sum of $5.25 per ton as a penalty, in accordance with the provisions of section 2 of the act of the General Assembly, approved August 27, 1911. (3) That the note sued on is void because the sacks did not have marked or branded thereon the sources and the ingredients from which the available phosphoric acid and nitrogen and potash were generated and obtained. (4) That the note sued on is void and uncollectible because 150 of the sacks of fertilizer were not tagged with tax-tags as the law provides. (5) That the note sued on is uncollectible because the words "high grade" were branded upon each of the sacks, when the fertilizer in the sacks was not a complete fertilizer, as indicated by the guaranteed analysis branded upon said sacks as hereinbefore set forth. (6) That the fertilizer was inferior in quality, and, by reason of the deficiency in the value of the crops which the defendant made, below those which he would have made had the fertilizer been as guaranteed, he has been damaged in the sum of $3,000; for which sum he prays judgment against the plaintiff.

The plaintiff demurred to the answer, upon the following grounds: (1) that no meritorious defense is set forth; (2) that the defendant seeks to claim double damages,—damages by way of penalty and also damages by reason of the fact that the commercial value of the fertilizer was more than 3 per cent. below the guaranteed value; (3) that the allegation in reference to the actual percentage of nitrogen which the fertilizer contained, as determined by an official analysis, is a bare conclusion of the pleader, there being no facts set forth to show that the analysis was such as by law had any binding force or effect upon the plaintiff; (4) that the defense that the plaintiff failed to brand on the sacks the sources from which the ingredients of the fertilizer were taken is not good in law; (5) that the paragraph of the answer which avers that some of the

sacks of fertilizer were not tagged sets forth no valid defense; (6) that the paragraph in the answer which avers that the note was void because the words "high grade" were branded upon the sacks sets forth no valid defense; and (7) that the paragraph of the answer which claims damages by reason of a deficiency in the crops sets forth no defense; and if it is valid as a defense, the defendant should be required to elect whether he will recover the penalty prescribed by the act of August 27, 1911, or actual damages. The trial judge sustained the ground raising the point that the plaintiff was not required to mark upon the sacks the sources and ingredients from which the acid, potash, and nitrogen were generated and obtained, and overruled all of the other grounds of the demurrer. To this ruling the plaintiff excepted pendente lite. The trial resulted in a verdict in favor of the plaintiff for $978 principal, $33.64 interest, and $98.19 attorney's fees. The plaintiff and the defendant each moved for a new trial, and both motions were overruled. Each excepted. The plaintiff assigns error upon the overruling of its demurrer to the defendant's answer, and upon the overruling of its motion for a new trial, and the defendant complains of the overruling of his motion for a new trial, which was based solely upon the ground that a verdict in his favor was demanded because the undisputed evidence showed that some of the fertilizer had not been tagged as required by law.

1. We have already held that a note given for fertilizer is not void merely because the tax-tags were not attached to the packages containing the fertilizer. *Hillis* v. *Comer,* ante, 214 (78 S. E. 1107). That decision was based upon the construction of the act of December 18, 1901 (Civil Code, § 1771 et seq.). The decision in *Zipperer* v. *Doyle,* 124 *Ga.* 895 (53 S. E. 505), holding that no recovery could be had for the purchase-price of fertilizer which was not tagged as required by law, dealt with a sale made prior to the date upon which the act of 1901 went into effect. Under the law as it stood prior to the passage of that act, an obligation for the purchase-price of fertilizer could not be collected if it appeared that the fertilizer had not been tagged as required by law. This is not true, however, under the act of 1901; nor is there in the act of August 27, 1911 (Acts 1911, p. 172), anything rendering uncollectible an obligation for fertilizer merely because it has not been tagged as required by law.

2.  By the Civil Code, § 1774, it is provided that if the commercial value of fertilizer shall fall 3 per cent. below its guaranteed total commercial value, any note or obligation given in payment therefor would be collectible by law only for the amount of actual total value as ascertained by an official analysis made by the department of agriculture.  By section 2 of the act of August 27, 1911, it is provided that if the actual value of the fertilizer fall more than 3 per cent. below the guaranteed commercial value, the vendor shall be liable in damages to the purchaser in the sum of 25 per cent. of the purchase-price plus the shortage of such commercial fertilizer.  It is thus expressly declared that the purchaser may recover the penalty and set off the difference between the actual value and the guaranteed value, if the difference is more than 3 per cent.

3.  Section 1775 of the Civil Code provides that "the words 'high grade' shall not appear upon any bag or other package of any complete fertilizer which complete fertilizer contains by its guaranteed analysis less than 10 per cent. available phosphoric acid, 1.65 per cent. nitrogen,  .   .  or a grade or analysis of equal total commercial value."  Section 643 of the Penal Code makes it a misdemeanor to sell any fertilizer without having complied with the provisions of law as to inspection, analysis, and sale of the fertilizer.  This section seems to be broad enough to include a false brand of the words "high grade" upon a fertilizer which contains less than 10 per cent. of available phosphoric acid and 1.65 per cent. nitrogen, or a grade not of equal total commercial value.  Sections 3 and 4 of the act of 1911 provide that if there shall be a deficiency of more than 10 per cent. below the guaranteed analysis of the fertilizer as published and branded on the sacks or packages, the vendor so publishing the analysis of the fertilizer shall be liable to the purchaser in the sum of 25 per cent. of the purchase-price plus the shortage of the fertilizer.  While the section of the Penal Code above referred to makes it a misdemeanor to violate any of the laws in reference to the analysis, sale, and inspection of fertilizer, yet in construing this section in connection with the existing laws upon the subject of inspection, analysis, and sale of fertilizer, we do not think that the mere fact that the words "high grade" were branded upon a package of fertilizer which contained less than 1.65 per cent. nitrogen renders an obligation given for the purchase-price of the

fertilizer entirely void. Under the act of 1901, a deficiency of less than 3 per cent. was regarded as immaterial and as not affecting the right of the seller to recover the full amount of the purchase-price. It has always been illegal for the seller of fertilizer to brand upon the package an analysis showing a value more than 3 per cent. above the actual value of the fertilizer. But in such a case the remedy of the purchaser is not to defeat collection of the entire purchase-price, but simply to reduce it to an amount which would represent the difference between the guaranteed value and the actual value of the fertilizer. The act of 1911 gives an additional remedy, to wit, the collection of a penalty from the seller. Under that act, if any fertilizer shall prove deficient in any of its ingredients as guaranteed or branded thereon, and if, by reason of such deficiency, the commercial value of the fertilizer shall fall 3 per cent. below the guaranteed value, then the vendor is liable in damages to the purchaser in the sum of 25 per cent. of the purchase-price plus the shortage; and if the vendor brand a false or incorrect analysis on the fertilizer, and there is a deficiency of more than 10 per cent. below the guaranteed analysis thus branded, he is liable to the purchaser in the sum of 25 per cent. of the purchase-price plus the shortage. Where there has been a false branding and where the fertilizer sold proves deficient, the remedy of the purchaser is to recover the damages provided for by the act of 1911, plus the difference between the actual commercial value and the guaranteed commercial value of the fertilizer. We do not think the mere marking of the words "high grade" on a package of fertilizer which contains less than 1.65 per cent. nitrogen would defeat the collection of the entire purchase-price. Taking all the provisions of law upon the subject together, the remedy of the purchaser is simply to reduce the amount of recovery as provided for in the code and the act of 1911.

4. The defendant accepted the fertilizer upon the express stipulation in the note that the payee refused to make any warranty or representation as to quality of the fertilizer, but left the purchaser to rely solely upon the fact that the laws of the State had been complied with. If, therefore, the seller complied with all of the laws in reference to the analysis, inspection, and sale of the fertilizer, the purchaser could not defend upon the ground that the fertilizer was deficient in quality, and that he was damaged by reason

of the fact that his crops were poor. If the seller complied with the laws, then the purchaser got what he bought; that is, a fertilizer which had been sold after compliance with all the laws of the State by the seller. The seller expressly declined to warrant the quality of the fertilizer. The purchaser accepted the limited warranty. He is bound by his contract, and the only defenses available to him, in the absence of fraud, are that the seller failed to comply with some of the laws of the State, and that for this reason he has been damaged. *Jackson* v. *Langston,* 61 *Ga.* 391; *Allen* v. *Young,* 62 *Ga.* 617; *Patterson* v. *Ramspeck,* 81 *Ga.* 808 (10 S. E. 390); *Pryor* v. *Ludden,* 134 *Ga.* 288 (67 S. E. 654, 28 L. R. A. (N. S.) 267). The measure of the purchaser's damages is fixed by law, and is limited to a recovery of the difference between the guaranteed commercial value of the fertilizer and the actual commercial value together with the penalty prescribed by the act of 1911. This being true, it is unnecessary to determine whether, if there had been no such stipulation in the note limiting the warranty, the defendant might have recovered the penalty and also damages for a breach of the implied warranty.

5. Error is assigned upon the admission in evidence of a certified copy, from the office of the commissioner of agriculture, of what purported to be an official analysis, made by the State chemist, of certain fertilizer. Upon the face of this document it appeared that the Arlington Oil and Guano Company had registered with the commissioner of agriculture during the season of 1911 and 1912 a brand of fertilizer known as the "Arlington High Grade," with a guaranteed analysis of available phosphoric acid of 10 per cent., nitrogen 1.65 per cent., and potash 2 per cent.; that upon the analysis made by the State chemist the brand thus registered actually contained 10 per cent. phosphoric acid, 1.65 per cent. nitrogen, and 2.04 per cent. potash; that the guaranteed commercial value was $17.37, and the actual value, as found by the State chemist, was $16.15. The code provides that all persons desiring to sell fertilizer in this State must file with the commissioner of agriculture the name of each brand of fertilizer and the guaranteed analysis thereof, and, before offering the same for sale, must brand on each package the guaranteed analysis of the fertilizer. The guaranteed analysis thus fixed by the seller must remain uniform throughout the fiscal year for which it is registered, and in no case

shall the grade be lowered, though the proportion of the constituents may be changed so that the decrease of one may be compensated in value by the increase in the other, such change, however, to receive the approval of the commissioner of agriculture. See Civil Code, §§ 1771, 1772, 1777. Whenever a brand of fertilizer thus registered is analyzed by the State chemist, a copy of such official analysis on file in the department of agriculture is admissible in evidence in any of the courts of this State on the trial of an issue involving the merits of the fertilizer. Civil Code, § 1773. The exact point made by the objection to the admission of the certified copy of the analysis is that it does not appear to have been the analysis of any fertilizer sold to the defendant. We do not understand the law to be that before an official analysis made by the State chemist is admissible in evidence, it must appear that some of the particular lot of fertilizer sold has been withdrawn, sent to the department of agriculture, and analyzed by the State chemist. All of the fertilizer sold under the same name is presumed to contain substantially the same ingredients, in the same proportions. The seller is forbidden by law to change the constituents after the registration of the particular brand of fertilizer. When, therefore, the plaintiff registered with the commissioner of agriculture the brand of fertilizer known as the "Arlington High Grade," the presumption was that all of the fertilizer of that brand contained substantially the same ingredients. The document offered in evidence shows upon its face that it contains an analysis, made by the State chemist, of the brand of fertilizer known as the "Arlington High Grade," manufactured and sold by the Arlington Oil and Guano Company. It is immaterial at what time this analysis was made, or from what particular package or lot of fertilizer the sample from which the analysis was made was taken. All that the law requires is that it should be an official analysis of the brand of fertilizer put on the market by the plaintiff, made by the State chemist at some time after the brand was registered with the department of agriculture. The law will not presume that the seller has violated the law by changing the constituent elements of fertilizer after the brand has been registered, but will indulge the contrary presumption that no such change has been made, and that the fertilizer sold to the defendant actually contained the same constituent elements as did the fertilizer analyzed by the State chemist.

Of course, as suggested by counsel for the fertilizer company, it would be quite an easy matter for every purchaser of fertilizer to withdraw a sample and have it analyzed by the State chemist and retain the analysis, for use at any time it might become material to his interest. But we do not understand that the law places this burden on a purchaser of fertilizer. He has a right to assume that the seller has complied with the law, and that the guaranteed analysis as branded upon the package is substantially the same as would appear from an actual analysis of the fertilizer. The official analysis made by the State chemist of any of the fertilizer at any time, which is of record in the department of agriculture, is available to any person who may desire to use it, and a certified copy of such analysis is admissible in any of the courts of this State when it becomes material to determine the actual ingredients contained in the fertilizer. Any other rule would entirely destroy the right of the purchaser to plead and prove the deficiency, if he had failed to withdraw from the particular lot sold to him a sample for the purpose of analysis by the State chemist. And we do not think the law was designed to have this effect. There is no law which prohibits a seller or manufacturer of fertilizer from raising the grade after it has been registered with the commissioner of agriculture. So that, if in a particular case the seller could show that since the analysis relied on by the purchaser was made, the grade of the fertilizer had been raised and the fertilizer actually sold to the purchaser did contain ingredients which were equal to those contained in the guaranteed analysis, this would be a complete reply to the official analysis made by the State chemist. There was no attempt, however, in the present case to meet the evidence of the constituent elements of the fertilizer as shown by the official analysis, and, in the absence of something to impeach its correctness, it would be conclusive upon the parties.

6. While, under our view of the law, the trial judge erred in not striking certain portions of the answer, the verdict indicates that it could not have been based upon any portions of the answer which should have been stricken, and one of the principal errors made by the court was corrected by overruling the defendant's motion for a new trial. For these reasons the judgments overruling the motions for a new trial will be                    *Affirmed.*